## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 19-CV-61046-JMS

**ERIKA MOSIEJUTE,**

    Plaintiff,

v.

**WAL-MART STORES EAST, LP,**

    Defendant.

_____/

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS MATTER** came before the Court upon Defendant's Motion for Summary Judgment and Supporting Memorandum of Law ("Motion") [DE 57], filed on October 30, 2020. I have reviewed the Motion, the Response [DE 67] and Reply [DE 69] thereto, all other summary judgment materials, and all other pertinent portions of the record. For the reasons discussed herein, the Motion [DE 57] will be **GRANTED**.

### BACKGROUND

In this case, Plaintiff brings interference and retaliation claims under the Family and Medical Leave Act ("FMLA") against her former employer. Plaintiff began working for Defendant as a cashier in 2001. Declaration of Erika Mosiejute ("PL Decl.") [DE 68-1] ¶ 6. Over time, she received several promotions, eventually becoming a Store Manager in 2015. *Id.* ¶ 7. *See also* Defendant's Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment ("DEF Stmt.") [DE 58] ¶ 1; Plaintiff's Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment ("PL Stmt.") [DE 68] ¶ 1. Thereafter, Plaintiff received two further promotions, becoming the Store Manager of larger locations – first Defendant's "Sawgrass Store" (in 2016 or 2017), then Defendant's "Broward Store" (in October

2018). PL Decl. ¶¶ 8-9; Deposition of Erika Mosiejute ("PL Depo.") [DE 58-1] at p. 17. *See also* DEF Stmt. ¶ 1; PL Stmt. ¶ 1.

On January 12, 2019, Plaintiff was involved in a car accident and required hospitalization. PL Decl. ¶ 17. Nevertheless, she continued working through January 24, 2019, at which time she was re-hospitalized. *Id.* ¶ 18. Due to her "serious health condition," Plaintiff applied for and received FMLA leave from January 25, 2019 until April 18, 2019. Amended Complaint [DE 15] ¶¶ 10-11; Answer [DE 27] ¶¶ 10-11. *See also* PL Decl. ¶ 20. In her declaration, Plaintiff states that Defendant did not "provide any paperwork and/or notice to [her] regarding [her] rights under the FMLA despite notice of an FMLA-qualifying event, but rather, [she] was forced to seek out FMLA leave on [her] own accord from Sedgwick." PL Decl. ¶ 19. Sedgwick is a third party that manages the leave process for Defendant. Deposition of Jacqueline Perez ("Perez Depo.") [DE 58-5] at p. 14. It is commonly known across Defendant's organization that employees seeking leave must contact Sedgwick. *Id.* at pp. 25-26.

When Plaintiff returned from leave on April 18, 2019, she reported to Defendant's Market Office as instructed. DEF Stmt. ¶¶ 39-40; PL Stmt. ¶¶ 39-40. There, she was interviewed (or, in Plaintiff's words, interrogated) by Market Asset Protection Manager Timothy Regan ("Regan") in connection with an asset protection investigation regarding bulk sales of cell phones and the receipt of gifts from a bulk-sales customer. *See* DEF Stmt. ¶¶ 40-43; PL Stmt. ¶¶ 40-43. Plaintiff states that during the interview, Regan made derogatory remarks towards her, telling her "she looked good for someone who was so sick" three (3) times, and asking her whether her medical condition would reoccur. PL Decl. ¶¶ 24-25. Regan's supervisor, Regional Asset Protection Manager Christina Brosky ("Brosky"), observed the interview as a witness. DEF Stmt. ¶ 40; PL Stmt. ¶ 40.

Regan's investigation began back in February 2019 when Plaintiff was on leave. *See* DEF Stmt. ¶ 16; PL Stmt. ¶ 16. While conducting routine tours of the Broward Store and the Sawgrass Store (the same day), Regan observed what he believed to be suspicious activity from a customer named Mohammad (at both stores). DEF Stmt. ¶¶ 16-20; PL Stmt. ¶¶ 16-20. Consequently, Regan reviewed Mohammad's transaction records and video footage, and he determined that members of management at the Sawgrass Store "had been placing special orders in order to facilitate bulk sales to Mohammad." DEF Stmt. ¶¶ 21-22; PL Stmt. ¶¶ 21-22. He thus proceeded to interview eight members of the store's management team. DEF Stmt. ¶ 23; PL Stmt. ¶ 23.

Regan learned that when Plaintiff was the Store Manager of the Sawgrass Store, she had introduced Mohammad to several members of management, calling Mohammad an "important customer." Declaration of Timothy Regan ("Regan Decl.") [DE 58-6] ¶ 6. From the interviews, Regan also learned that Plaintiff "approved and initiated the bulk sales of prepaid cellular phones to Mohammad" when she was the Store Manager of the Sawgrass Store. *Id.* Plaintiff disputes Regan's finding that she approved and initiated such sales. *See* DEF Stmt. ¶ 24; PL Stmt. ¶ 24. According to Plaintiff, she did not engage in bulk sales after receiving a March 2018 email from Defendant's Home Office notifying her of bulk cell phone sales occurring at the Sawgrass Store and Defendant's policy prohibiting such sales, the Sale of Prepaid Wireless Merchandise Policy, OP-45. *See* PL Decl. ¶ 14; DEF Stmt. ¶¶ 5-12; PL Stmt. ¶¶ 5-12. That policy provides that "[w]ireless hardware (cellphones, etc) purchases will be limited to two of the same (UPC/Item Number) item at one time during the same transaction." [DE 58-1] at p. 122. It further provides that the "limit is set via POS restrictions" and that "[s]tore management and associates are not authorized to override [the] POS restriction." *Id.* In arguing that she did not violate the policy after receiving the March 2018 Home Office email, Plaintiff contends that the policy does not limit

the amount of transactions per customer. [DE 67] at p. 13. Thus, she argues that an employee who sells ten (10) cell phones to a customer as part of five (5) separate transactions (in a row) does not violate Defendant's policy so long as only two (2) phones are sold in each of the five (5) transactions. *Id. See also* PL Decl. ¶¶ 11-14.

During his investigation, Regan determined that of the ten (10) stores in the market where he oversaw asset protection, only two (2) stores sold significant numbers of prepaid cell phones (from January 1, 2018 through January 31, 2019). DEF Stmt. ¶¶ 27-29; PL Stmt. ¶¶ 27-29. Those two stores were the Sawgrass Store (where the number was the highest) and the Broward Store. DEF Stmt. ¶¶ 28-29; PL Stmt. ¶¶ 28-29. Regan determined that the high sales numbers were the result of bulk sales. DEF Stmt. ¶¶ 28-29; PL Stmt. ¶¶ 28-29. At the Sawgrass Store, bulk sales continued following Plaintiff's receipt of the March 2018 email. Regan Decl. ¶ 12. At the Broward Store, bulk sales only began after Plaintiff became the Store Manager in October 2018. DEF Stmt. ¶ 31; PL Stmt. ¶ 31.

In reviewing data from the Broward Store, Regan determined that Co-Manager Byron Gore ("Gore") had placed large prepaid cell phone orders. Regan Decl. ¶¶ 14-15. Gore confirmed he did so to sell them to Mohammad. *Id.* ¶ 15. According to Gore, Plaintiff introduced him to Mohammad (referring to Mohammad as the "phone guy") and told him to take care of, and buy phones for, Mohammad. *Id.* ¶ 16. Gore said he had never conducted a bulk sale in his over seventeen (17) years with Defendant until directed to do so by Plaintiff. *Id.* ¶ 17. *See also* DEF Stmt. ¶¶ 32-36; PL Stmt. ¶¶ 24, 32-36.

Ultimately, Regan determined it would be necessary to interview Plaintiff in conjunction with his investigation. Regan Decl. ¶ 18. As noted above, that interview occurred on April 18, 2019, when Plaintiff returned from leave. During the interview, in addition to discussing alleged

bulk-sales issues, Regan and Plaintiff discussed Plaintiff's receipt of gifts from Mohammad. Specifically, Plaintiff acknowledged receiving two (2) gifts from Mohammad. PL Decl. ¶ 29; Regan Decl. ¶ 23. *See also* DEF Stmt. ¶ 43; PL Stmt. ¶ 43. In her declaration, she states that she received the gifts from Mohammad "as a friend or familiar acquaintance." PL Decl. ¶ 29. However, Plaintiff had not previously stated that Mohammad was a friend, either during her interview or at her deposition. *See* Deposition of Christina Brosky ("Brosky Depo.") [DE 58-4] at p. 50; PL Depo. at pp. 26-30.[1] Instead, she said that she was first introduced to Mohammad after arriving at the Sawgrass Store by the current management, who said Mohammad was a customer who bought merchandise in bulk. PL Depo. at pp. 26-27. When asked when she would interact with Mohammad, Plaintiff said when she saw him at the store. *Id.* at p. 28. Outside of the store, they did not communicate (with the exception of a single message Mohammad sent Plaintiff, to which she did not respond). *Id.* at 29-30.

At the conclusion of Plaintiff's interview, Plaintiff prepared a written statement. Therein, she recounted seeing Mohammad "in the store twice a month, sometimes once a week, which could account for 10, 20, 30 transactions in total." [DE 58-1] at p. 129. Plaintiff also noted the gifts she had received from Mohammad. *Id.* After the interview concluded and Plaintiff provided her written statement, she was told to return home pending the outcome of Defendant's investigation and that Defendant would be in touch. Brosky Depo. at p. 47; PL Decl. ¶ 26. Six (6) days later, on April 24, 2019, Brosky and a regional human resources director called Plaintiff to inform her of the termination of her employment, effective immediately. PL Depo. at pp. 54-55. *See also* DEF Stmt. ¶ 48; PL Stmt. ¶ 48. In addition to Plaintiff, an assistant manager and a co-manager were terminated as a result of Defendant's investigation. DEF Stmt. ¶ 47; PL Stmt. ¶ 47.

---

[1] The word "friend" does not appear at all in Plaintiff's deposition transcript.

Defendant decided to terminate these individuals (including Plaintiff) because they were the only salaried members of management who accepted or facilitated gifts from Mohammad. DEF Stmt. ¶ 47; PL Stmt. ¶ 47. Nevertheless, all employees involved in the bulk sales of phones received some level of discipline. DEF Stmt. ¶ 47; PL Stmt. ¶ 47.

On April 25, 2019, the day after Plaintiff's termination, Plaintiff filed this case [DE 1]. She subsequently filed an Amended Complaint [DE 15], but only to name the correct defendant entity [*see* DE 13]. The Motion, pursuant to which Defendant seeks summary judgment on both of Plaintiff's claims, has now been fully briefed and is ripe for review.

## **LEGAL STANDARD**

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007) (citing *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir.1996)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (internal quotation marks omitted) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Initially, it is the moving party's "burden to demonstrate the basis for its motion, and [it] must identify the portions of the record 'which it believes demonstrates the absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The movant may meet this burden by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* (citing *Celotex*, 477 U.S. at

322-23). *See also Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (The movant may satisfy its burden "by 'showing' or 'pointing out' to the Court that there is an absence of evidence to support the non-moving party's case." (citing *Celotex*, 477 U.S. at 325)). Provided that the moving party meets its burden, the burden then shifts to the non-moving party to show that a genuine issue of material fact exists. *Hornsby-Culpepper*, 906 F.3d at 1311-12.

To establish a dispute of fact sufficient to avoid the entry of summary judgment, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *A.L. ex rel. D.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270, 1289 (11th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "However, a mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson*, 477 U.S. 242). Nevertheless, courts "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citation omitted). Moreover, all reasonable doubts regarding the facts must be resolved in favor of the non-moving party. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation omitted).

## ANALYSIS

### I. INTERFERENCE

Plaintiff's FMLA interference claim is meritless because the undisputed facts show that any interference by Defendant resulted in no harm to Plaintiff, who was not denied any FMLA benefit to which she was entitled. "The FMLA provides eligible employees the right to 12 weeks of leave for a serious health condition that makes the employee unable to perform the functions of

her position." *Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1274 (11th Cir. 2020) (citing *Batson v. Salvation Army*, 897 F.3d 1320, 1328 (11th Cir. 2018)). "An FMLA interference claim lies if an employee can demonstrate by a preponderance of the evidence that she was entitled to an FMLA benefit *and her employer denied her that benefit*." *Id.* (citing *Batson*, 897 F.3d at 1331) (emphasis added). *See also White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015) ("An interference claim has two elements: (1) the employee was entitled to a benefit under the FMLA, and (2) her employer denied her that benefit." (citing *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235 (11th Cir. 2010))).

In the Motion, Defendant argues that it is entitled to summary judgment on Plaintiff's interference claim because Plaintiff received the twelve (12) full weeks of FMLA leave that she requested. [DE 57] at p. 3. Plaintiff responds by arguing that Defendant is liable for interference because it did not provide Plaintiff with documents or notice regarding her FMLA rights even though Defendant was on notice of Plaintiff's eligibility for FMLA leave. *See* [DE 67] at p. 6; PL Decl. ¶ 19. Even if a technical violation had occurred, which Plaintiff has not shown,[2] Plaintiff's interference claim still clearly fails. That is because "to prevail on her FMLA interference claim, [Plaintiff] must show harm from the alleged interference with her rights." *Munoz*, 981 F.3d at 1274-75 (citing *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1284 (11th Cir. 1999)). But

---

[2] "When an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances." *Munoz*, 981 F.3d at 1274 (quoting 29 C.F.R. § 825.300(b)(1)). "An employer's failure to notify an employee about her right to take FMLA leave 'may constitute an interference with, restraint, or denial of the exercise of [her] FMLA rights.'" *Id.* (quoting 29 C.F.R. § 825.300(e)). Although Plaintiff states Defendant failed to provide notice of her FMLA rights, she fails to provide facts to show that Defendant did not notify her of such rights when Defendant was required to do so. Notably, in stating that Defendant failed to provide notice to Plaintiff "despite [Defendant's] notice of an FMLA-qualifying event," PL Decl. ¶ 19, Plaintiff fails to support this conclusory contention (regarding Defendant being on notice) with any facts.

Plaintiff cannot show harm given that she received the full amount of leave she requested. *See id.* at 1275 (finding that employee who was not denied leave time failed to show damages supporting her FMLA interference claim). In other words, Plaintiff has failed to show that she was denied any benefit. Therefore, Defendant is entitled to summary judgment on Plaintiff's FMLA interference claim.

## II.     RETALIATION

Defendant is entitled to summary judgment on Plaintiff's retaliation claim because Plaintiff has failed to show that Defendant's reason for terminating Plaintiff was pretextual. To prevail on her FMLA retaliation claim, Plaintiff must demonstrate that Defendant "intentionally discriminated against [her] in the form of an adverse employment action for having exercised an FMLA right." *Jones*, 854 F.3d at 1270. Thus, she must show that Defendant's "actions were motivated by an impermissible retaliatory or discriminatory animus." *Id.* (internal quotation marks and citation omitted). Both parties correctly recognize that the burden-shifting framework, from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies in analyzing Plaintiff's FMLA retaliation claim. *See* [DE 57] at p. 5; [DE 67] at p. 7. *See also Munoz*, 981 F.3d at 1275 ("We analyze a claim of FMLA retaliation under the burden-shifting framework articulated in *McDonnell Douglas*.").[3] Accordingly, Plaintiff must first "make a prima facie case showing that: (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action;

---

[3] The burden-shifting framework applies where "an employee alleges retaliation under the FMLA . . . without direct evidence of the employer's intent." *Batson*, 897 F.3d at 1328. *See also Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017) ("Because Jones has put forth no direct evidence of retaliation, we must employ the burden-shifting framework established by the Supreme Court in *McDonnell Douglas* . . . to analyze his retaliation claim." (citing *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1243 (11th Cir. 2010))). Plaintiff does not argue that such direct evidence exists (as none does), and instead, applies the burden-shifting framework (as does Defendant).

and (3) there is a causal connection between the two." *Munoz*, 981 F.3d at 1275. If Plaintiff is able to establish a prima facie case, the burden shifts to Defendant "to articulate a nondiscriminatory reason for the adverse action." *Id.* Defendant's burden to do so is "exceedingly light." *DuChateau v. Camp Dresser & McKee, Inc.*, 822 F. Supp. 2d 1325, 1340 (S.D. Fla. 2011), *aff'd*, 713 F.3d 1298 (11th Cir. 2013) (citing *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir.1994)). Provided that Defendant articulates a non-discriminatory reason, the burden shifts back to Plaintiff to produce evidence showing that Defendant's reason is pretextual. *Munoz*, 981 F.3d at 1275.

### A. PRIMA FACIE CASE

Here, it is undisputed that Plaintiff engaged in statutorily protected activity and that she suffered an adverse employment action. Thus, whether she has established a prima facie case turns on whether there is a causal connection between her engaging in statutorily protected activity (by taking FMLA leave) and her termination (the adverse employment action). "To show a causal connection, an employee must demonstrate that 'the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated.'" *Id.* at 1277 (quoting *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008)). In arguing a causal connection exists, Plaintiff primarily relies on the proximity of her termination date to her return from leave – the events being six (6) days apart. Relatedly, Plaintiff notes that she was told to return home after her interview (that occurred immediately upon her return from FMLA leave), before her ultimate termination days later. She also argues that Regan's derogatory statements constitute further evidence on the issue of causation.

Plaintiff is correct that the temporal proximity here is sufficient to establish a genuine issue of material fact regarding whether a causal connection exists. "Close temporal proximity between

protected conduct and an adverse employment action is generally 'sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.'" *Jones*, 854 F.3d at 1271 (quoting *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006)). *See also Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001) ("Proximity in time is sufficient to raise an inference of causation." (quoting *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000))). "But temporal proximity, without more, must be very close in order to satisfy the causation requirement." *Jones*, 854 F.3d at 1271-72 (citing *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)) (internal quotation marks omitted). Notably, "temporal proximity, for the purpose of establishing the causation prong of a prima facie case of FMLA retaliation, should be measured from the last day of an employee's FMLA leave until the adverse employment action at issue occurs." *Id.* at 1272. In this case, "temporal proximity" was undoubtedly "very close" given Plaintiff's suspension the day she returned from leave and her termination six (6) days later. Thus, it is sufficient to establish a jury issue on causation (given that Defendant does not argue its decision-makers were unaware of Plaintiff's FMLA leave).

Defendant, however, argues that close proximity is insufficient on its own to establish causation. [DE 57] at p. 5. In doing so, Defendant takes a footnote from *Strickland* out of context.[4] The issue in *Strickland* was different. In *Strickland*, the employee had failed to adduce any

---

[4] The footnote, a portion of which is referenced in the Motion, provides as follows:

> We read *Brungart* as holding that close proximity in time between the protected activity and the adverse employment decision does not, standing alone, establish the third element of a prima facie case. Instead, the close proximity merely buttresses other evidence (direct or circumstantial) in the case indicating that the decision maker had notice of the protected activity.

*Strickland*, 239 F.3d at 1207 n.10.

evidence showing he sought or needed FMLA leave; instead, the "unrebutted evidence" revealed an absence of knowledge on the part of the employer's decision-makers that the employee engaged in, or attempted to engage in, protected conduct. 239 F.3d at 1207. On the contrary, in this case, Defendant does not contend that its decision-makers lacked knowledge of Plaintiff's FMLA leave (the protected activity) when they terminated her. Moreover, Brosky, who was involved in the decision to terminate Plaintiff, or at least recommended Plaintiff's termination and informed Plaintiff of her termination, *see* Brosky Depo. at pp. 20, 34-35, 71, became aware of Plaintiff's FMLA leave prior to Plaintiff's termination, *see id.* at p. 18. Thus, because lack of knowledge of protected activity is not at issue here (unlike *Strickland*), the "very close" temporal proximity is sufficient to make causal connection a jury issue (or, rather, it would be a jury issue but for the fact that Plaintiff has not established pretext, as discussed in Section C below).

### B. LEGITIMATE REASON FOR ADVERSE ACTION

Defendant states that "Plaintiff was terminated as a result of the findings of an asset protection investigation into bulk prepaid cellular phone sales." [DE 57] at p. 2. Defendant indicates that its investigation implicated Plaintiff in the bulk sales that occurred, and Defendant asserts that such bulk sales violated company policy. Additionally, Defendant notes that Plaintiff also violated company policy by accepting gifts from Mohammad, the bulk-sales customer at the center of the investigation, on two (2) separate occasions. [DE 57] at p. 7. In her Response, Plaintiff does not appear to argue that Defendant has failed to articulate a legitimate reason for termination. Instead, she argues that the reason Defendant offers is pretextual. *See* [DE 67] at p. 9 ("Defendant's Legitimate Reason is Pretextual."). In any event, Defendant has surely satisfied its light burden by articulating a legitimate nondiscriminatory reason for termination. *Cf. Munoz*, 981 F.3d at 1277 (finding employer articulated legitimate reason where it said it terminated

employee for "insubordination, ineffectiveness, and her tendency to handle personal projects while at work").

### C. PRETEXT

Plaintiff's evidence is legally insufficient to allow a reasonable jury to find that Defendant's stated reasons for terminating Plaintiff's employment are pretextual. "To show pretext, an employee must introduce evidence 'sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Munoz*, 981 F.3d at 1277 (quoting *Jones*, 854 F.3d at 1274). "This evidence may include the evidence already produced by the employee to establish her prima facie case." *Id.* (citing *Jones*, 854 F.3d at 1274). "A showing of pretext arises from 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action.'" *Id.* (quoting *Jones*, 854 F.3d at 1274). However, simply "quarreling with the wisdom" of Defendant's stated reasons for termination is insufficient to demonstrate pretext. *Jones*, 854 F.3d at 1274.

In attempting to establish pretext, Plaintiff relies on the evidence she pointed to regarding causal connection – proximity and Regan's comments – and also raises additional arguments. Specifically, she argues that Gore is a comparator who was treated differently, and she argues that she did not actually violate Defendant's bulk-sales policy. As discussed in Section 1 below, Gore does not qualify as a comparator. As discussed in Section 2 below, whether Plaintiff violated the bulk-sales policy is not the issue. The issue is whether Defendant had a good faith belief that Plaintiff violated the policy, and it did. Finally, as discussed in Section 3 below, the remaining pieces of evidence of pretext – temporal proximity and Regan's comments – are insufficient to overcome summary judgment on their own.

### 1. Gore's Comparator Status

As indicated above, Plaintiff argues that Gore is a comparator who was treated more favorably than Plaintiff and that Gore's more favorable treatment is of evidence of pretext.[5] However, Gore, the Co-Manager (under Plaintiff) at the Broward Store, is not a proper comparator because his basic conduct differed from Plaintiff's basic conduct in at least one material respect – only Plaintiff accepted gifts from Mohammad. To show that Gore is a competitor, Plaintiff would have to show that she and Gore are "similarly situated in all material respects." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1226 (11th Cir. 2019) (en banc). Ordinarily, a similarly situated comparator: (1) "will have engaged in the same basic conduct (or misconduct) as the plaintiff"; (2) "will have been subject to the same employment policy, guideline, or rule as the plaintiff"; (3) will generally "have been under the jurisdiction of the same supervisor as the plaintiff"; and (4) "will share the plaintiff's employment or disciplinary history." *Id.* at 1227-28. "In short, as its label indicates – 'all material respects' – a valid comparison will turn not on formal labels, but rather on substantive likenesses." *Id.* at 1228. Stated differently, "a plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.* (citation omitted).

Plaintiff and Gore are not similarly situated in all material respects. It is true that they are similarly situated in some material respects. They were subject to the same policies regarding bulk sales and gifts, and Defendant believed, based upon its investigation, that both Plaintiff and Gore violated the bulk-sales policy. However, Gore reported to Plaintiff. Moreover, Plaintiff's employment history reveals that she had previously been specifically instructed regarding the bulk-sales policy when a related issue arose during her tenure as the Store Manager of the Sawgrass

---

[5] Gore was disciplined, but he was not terminated. *See* DEF Stmt. ¶ 47; PL Stmt. ¶ 47.

Store. Most significantly, though, Plaintiff accepted gifts from Mohammad and Gore did not. Thus, the two did not engage in the same basic conduct (or misconduct). Notably, Plaintiff overlooks the fact that ALL salaried members of management who accepted or facilitated gifts from Mohammad, in violation of Defendant's policy, were terminated.

Plaintiff attempts to liken herself to Gore (and to differentiate herself from the other salaried members of management who accepted gifts from Mohammad) by claiming that she accepted gifts from Mohammad "as a friend or familiar acquaintance." In other words, Plaintiff implies that because of her relationship with Mohammad, she did not violate any gift policy. However, she does not dispute that employees who were not friends with Mohammad would have violated policy by accepting a gift from Mohammad.

Assuming an employee who was friends with Mohammad could have accepted a gift from Mohammad without violating policy does not further Plaintiff's argument because her contention regarding Mohammad being her friend or acquaintance does not pass muster. That is because Plaintiff has not offered up any non-conclusory facts to establish such a relationship, and her prior testimony regarding their relationship merely evidences a business relationship, not a friendship. *See* PL Depo. at pp. 26-30. Moreover, even assuming Plaintiff and Mohammad were friends, no evidence (including even conclusory statements) has been offered up to show that Defendant was aware of any such friendship at the time it decided to terminate Plaintiff's employment. Thus, even if such a relationship existed and would have excused compliance with Defendant's gift policy, Defendant could not have altered its belief regarding Plaintiff's misconduct without knowledge of such a relationship. *See Thomas v. Dolgencorp, LLC*, 645 F. App'x 948, 951 (11th Cir. 2016) ("An employer is entitled to rely on a good faith belief that an employee has committed professional misconduct and does not need to prove that belief was correct." (citing *E.E.O.C. v.*

*Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000))). Accordingly, there is no evidence showing that Defendant lacked a good faith belief that Plaintiff violated the gift policy, a violation that materially distinguishes Plaintiff's conduct from Gore's conduct. Therefore, Gore is not a proper comparator under the circumstances.

### 2. Whether Plaintiff Violated Bulk-Sales Policy (OP 45)

Although Plaintiff argues that she did not violate Defendant's bulk-sales policy, whether she ultimately did or did not is immaterial. As noted above, what is material is whether an employer relies "on a good faith belief that an employee has committed professional misconduct," even if that belief proves to be incorrect. *Id. See also Hornsby-Culpepper*, 906 F.3d at 1313 ("Further, 'the inquiry into pretext centers on the employer's beliefs, not the employee's beliefs,' and '[a] plaintiff is not allowed to [merely] recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer.'" (quoting *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265-66 (11th Cir. 2010))). Here, the results of the extensive investigation undertaken by Defendant, including the statements Defendant obtained in connection with its investigation, undoubtedly reveal that Defendant had a good faith belief that Plaintiff violated the bulk-sales policy (as well as the gift policy) when it decided to terminate Plaintiff's employment.

Additionally, Plaintiff argues that Defendant deviated from its own bulk-sales policy and that such deviation is evidence of pretext. She implies that Defendant deviated from the bulk-sales policy by espousing a different interpretation than the interpretation Plaintiff suggests is more appropriate. Not only is Plaintiff's suggested interpretation one that would effectively vitiate the purpose behind the policy, but Plaintiff has failed to point to any instances in which Defendant has interpreted the policy in a manner contrary to how it does in this case. Moreover, "the fact that an

employer's decision was subjective, or that it was based on an unwritten or informal policy subject to differing interpretations, without more, does not show that it was pretextual." *Dent v. Ga. Power Co.*, 522 F. App'x 560, 563 (11th Cir. 2013) (citing *Conner v. Fort Gordon Bus Co.*, 761 F.2d 1495, 1501 (11th Cir. 1985)).

### 3. Evidence of Pretext

For the reasons discussed above, the only evidence Plaintiff has offered in support of pretext are Regan's statements and the proximity of Plaintiff's FMLA leave to her termination, which are insufficient to make pretext a jury issue under these circumstances. The Eleventh Circuit's (non-binding) decision in *Thomas*, where the court affirmed the entry of summary judgment on an FMLA retaliation claim and other claims, is instructive. *See* 645 F. App'x at 950-53.[6] There, the employee was a store manager who took FMLA leave to have a double mastectomy due to her cancer. *Id.* at 950. Like Plaintiff, the employee in *Thomas* was suspended the day she returned from FMLA leave pending the conclusion of an ongoing investigation, and she was then terminated upon the conclusion of the investigation. *See Thomas v. Dolgencorp, LLC*, 30 F. Supp. 3d 1340, 1345 (M.D. Ala. 2014). In rejecting the employee's pretext argument, the Eleventh Circuit considered the close temporal proximity between leave and termination, noting that the proximity between the two events did not show pretext on its own. *Thomas*, 645 F. App'x at 952. It also considered statements allegedly made by the employee's supervisor that the employee's "personal situations" affected her performance and that the supervisor could not "save" the employee's job, as well as alleged attempts to "dig up" things about the employee. *Id.* However, it noted that the supervisor made what were, at best, "stray remarks that do not create a material

---

[6] Although *Thomas* discussed the pretext issue in the portion of the opinion relating to the employee's discrimination claim under the Americans with Disabilities Act, the court noted that its pretext analysis also applied to the employee's FMLA retaliation claim. *See id.* at 953.

issue of fact concerning pretext." *Id.* In fact, as the court recognized, "[a] stray comment by a supervisor that is unrelated to the employment decision will usually not be sufficient to show pretext absent some additional evidence supporting a finding of pretext." *Id.* at 951 (citing *Scott v. Suncoast Beverage Sales, Inc.*, 295 F.3d 1223, 1229 (11th Cir. 2002)).

Here, the temporal proximity between leave and termination (and suspension pending the conclusion of the investigation) is substantially similar to that in *Thomas*. Additionally, like the supervisor's statements in *Thomas*, Regan's alleged remarks are nothing more than "stray remarks that do not create a material issue of fact concerning pretext." If anything, Regan's remarks have less value than those in *Thomas* because Regan was not Plaintiff's supervisor.

What really makes Plaintiff's attempt to establish pretext fall short, though, is that she does not adequately attack Defendant's proffered reason for termination head-on. *See Walls v. Lowe's Home Centers, LLC*, 789 F. App'x 852, 855 (11th Cir. 2019) ("As long as the employer offers a reason that might motivate a reasonable employer, the employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000))). Defendant offers a solid reason for Plaintiff's termination that is well-supported, well-documented, and based upon a thorough investigation. Moreover, Defendant's investigation was not one that started with an eye towards Plaintiff. It only led Defendant in Plaintiff's direction after employee interviews. Notably, Plaintiff, as the Store Manager of the Broward Store and the prior Store Manager of the Sawgrass Store, was ultimately at the center of everything. The two stores were the only stores in their market where bulk-sales activity occurred. There was certainly more than enough for Defendant to reasonably believe that Plaintiff violated the bulk-sales policy. Further, it is undisputed that she accepted gifts from Mohammad, and her attempt to claim that she could do so

as his friend is unavailing for the reasons discussed above. Ultimately, Plaintiff has not demonstrated anything inconsistent, contradictory, or implausible regarding Defendant's stated reason for termination, and Plaintiff cannot show that the real reason for termination was anything other than the reason articulated by Defendant. *See Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020) (en banc) ("Thus, to establish pretext at the summary judgment stage, a plaintiff must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" (citation omitted)); *Hornsby-Culpepper*, 906 F.3d at 1312 ("[A] reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'" (quoting *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007))). This is especially true where the other salaried members of management who engaged in misconduct substantially similar to Plaintiff's misconduct were also terminated as a result of the same investigation.

For the foregoing reasons, Plaintiff's evidence is insufficient to establish pretext.

## CONCLUSION

For the reasons discussed above, it is **ORDERED** and **ADJUDGED** that the Motion [DE 57] is **GRANTED**. The Court will enter a separate Final Judgment.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 26th day of January 2021.

*Jared Strauss*
Jared M. Strauss
United States Magistrate Judge